UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

MARY EICHLER,                                          :

                    Plaintiff,            :

       -against-                             :

AMERICAN INTERNATIONAL                    :
GROUP, INC.,

                            :

                Defendant.
--------------------------------------------------------x

**OPINION AND ORDER**

05 Civ. 5167 (FM)

**FRANK MAAS**, United States Magistrate Judge.

        In this action based on diversity of citizenship, plaintiff Mary Eichler

("Eichler") seeks to recover damages against her former employer, defendant American

International Group, Inc. ("AIG"), pursuant to state and local antidiscrimination laws.

Eichler contends that she was subjected to a sexually-hostile work environment, was

further victimized by retaliation after she complained about her situation, and eventually

was constructively discharged.[1]  AIG has now moved for summary judgment on all three

claims pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons set

forth below, that motion is granted and the complaint is dismissed.[2]

---

      [1]     Eichler's complaint also alleged in a Seventh Claim for Relief that AIG
"intentionally and/or negligently inflicted emotional distress upon [her] with complete disregard
for her emotional well-being."  (Compl. ¶ 68).  She subsequently has withdrawn that claim.  (See
Pl.'s Mem. at 2 n.1).

      [2]     On September 9, 2006, the parties consented to my exercise of jurisdiction over
this case for all purposes pursuant to 28 U.S.C. § 636(c).  (See Docket No. 9).

I.      Factual Background

        Unless otherwise noted, the following facts are either undisputed or set forth in the light most favorable to Eichler.

        Eichler became an AIG employee in January 2002, at which time she was assigned to its AI Marine Adjusters Division ("AIMA").  (Eichler Dep. 5, 7).  Eichler replaced a Japanese woman named Minoko Mitsumi ("Mitsumi").  (Id. at 22).  Her job involved the processing of "blue water" "follow-the-lead" hull insurance claims.  (Id. at 12-13).  The coverage decisions concerning those claims were made by another carrier, denominated the "lead underwriter."  Each claim consequently took her one hour or less to process.  (Id. at 13-14, 17; see also Corteselli Dep. at 111) (the lead underwriter would "advis[e] the followers we have now settled the claim for X and your portion of X is X . . . minus one.  Please send us your check.")

        AIMA's hull department in New York City had only a handful of employees.  (Corteselli Dep. 60, 90).  Vince Corteselli ("Corteselli") was Eichler's immediate supervisor.  (Eichler Dep. 16).  Corteselli, in turn, reported to Paul Ferguson, the regional claims manager.  (Id.).  Ferguson's direct supervisor was Steven Gillen, the president of AIMA.  (Id. at 21-22).

Shortly after she was hired, Eichler signed an acknowledgment that she had received an AIG employee handbook dated March 2000.  (Eichler Dep. at 9 & Ex. 1).[3] That handbook contained two distinct procedures for employee complaints.  For problems or complaints relating to areas other than discriminatory harassment, AIG employees were instructed to bring their concerns in the first instance "to the attention of [their] immediate supervisor[s]."  (Ex. 2 at 18).  In a separate section captioned "Non-Harassment," the handbook defined "sexual harassment," in part, as conduct of a sexual nature which, "if unwelcome and severe or pervasive, creates an intimidating, hostile or offensive working environment, or unreasonably interferes with an employee's work environment."  (Id. at 19).  Employees who believed that such "discriminatory harassment ha[d] occurred" were instructed to report it "immediately" to "a Human Resources Manager; to Corporate Employee Relations at 72 Wall Street, New York, NY 10270; or [to] the Office of General Counsel at 70 Pine Street, New York, NY 10270."  (Id. at 20).  The handbook further stated that AIG

> takes matters of discriminatory harassment very seriously and will conduct a prompt investigation of all complaints and take appropriate action based upon that investigation.  Any employee found to have engaged in any form of discriminatory harassment will be subject to appropriate disciplinary action, up to and including termination of employment.  Absolute confidentiality cannot be guaranteed.

---

[3]     References to an exhibit followed by an exhibit number refer to the exhibits marked at Eichler's deposition, taken on November 7, 2005.  References to an exhibit followed by a letter refer to the exhibits annexed to the certification of Kevin E. Barber, Esq., dated July 19, 2006.

> However, every effort will be made to handle all complaints
> and investigations with as much discretion and confidentiality
> as circumstances permit.

(Id.).  The handbook also noted that AIG would "not tolerate any retaliation against any employee for making a complaint, bringing inappropriate conduct to [its] attention, or for participating in an investigation of an alleged act of harassment."  (Id.).

Eichler remained an AIMA employee for approximately fourteen months. (See Ex. R).  During that time, she frequently was subjected to conduct on the part of Corteselli which she found objectionable.  For example, on two separate occasions, when Eichler was in Corteselli's office, he stated to someone over the telephone, in substance, "what do you think I'm doing, sitting here jerking off?"  (Eichler Dep. 40, 42).  On another occasion, while they both were in Ferguson's office, Corteselli told Eichler to "get off [her] fat ass" and "get out there and go to work."  (Id. at 31).  Corteselli also frequently told Eichler that she was "stupid" or used the word "fuck" in her presence. (Id. at 27-28, 36).  Eichler contends that Corteselli did not make similar statements to men.  (Id. at 30, 33).

Some of Corteselli's statements were more overtly gender based.  In one instance, Corteselli told Eichler, "You have tits.  Just cry.  They're not going to do anything."  (Id. at 43).  He also made extensive comments about her on one occasion while on the telephone, stating to someone unknown:

> Hey you want her?  I got the new girl.  You want her,  you
> can have her . . . . What does she look like?  She's all right.
> She's all right looking.

4

> Does she like it?  Of course, she likes it.  She's got five kids.
> To some man, I don't know.

(Id. at 44).  On other occasions, Corteselli commented that if he and Eichler were in Iran,

he "would be able to stone [her] to death because [she] was a woman."  (Id. at 46-48).

Although he made statements to this effect "at least a half dozen" times, Eichler did not

report them because she did not want people saying, "Look at her, she's the cry-baby.

She's doing this."  (Id. at 47, 49).

At one point, a friend of Eichler's offered to buy her daughter a pony.  After

learning this, Corteselli asked Eichler, "Why don't you just marry the guy and just stay

home?"  (Id. at 44-45).  At other times, he made similar comments, asking Eichler, "Why

don't you find a husband and go get married[?]  Like, get out of here.  Don't be in the

work force."  (Id. at 45).  According to Eichler, during one such conversation, when

Corteselli suggested that Eichler get married, the following interchange took place:

> I said, No. 1, he's one of my best friends.  No. 2, I'm not
> attracted to him in that way . . . . I told him that he was shorter
> than me, and I felt uncomfortable in that situation.  He told
> me . . . , it's not the size of it, it's the motion in the ocean.  My
> wife is taller than me.  She looks kind of like you.

(Id.).  Eichler was so upset that she responded to Corteselli's comment about "size" being

unimportant by saying, "They lied to you," before abruptly leaving the room.  (See id.).

Eichler twice complained in writing to supervisory personnel about

Corteselli's boorish behavior.  On Monday, April 8, 2002, she send Ferguson an email

which stated in part:

> Morning Paul.
>
> Sorry to have to include you in this at this time.  Below is a
> copy of an email I sent to Vince trying to resolve in a friendly,
> productive way the situation at hand[.]  I will also forward his
> reply which I find unproductive and in all honesty nasty.
>
> I will do my best to work with Vince but I am asking you to
> intercede and if necessary help me move to a different
> position at the first available opportunity as I do not see where
> there is an opportunity for a constructive work relationship
> [to] exist based on the reply Vince has given.

(Ex. L).[4]  The email that Eichler had sent to Corteselli the prior Friday acknowledged his

dissatisfaction with her work performance, detailed her efforts to accommodate those

concerns, and noted that:

> It has also been brought to my attention several times
> recently, by different people[,] how you and I go at it.  This
> has to stop[.  A]lthough I do not take it personally, it is
> [a]ffecting others who are including me as being part of this
> distraction and this cannot be.

(Id.).  Eichler also explained to Corteselli that she had resorted to an email "because when

I try to talk to you there are times when I find you unreasonable and I am not allowed to

speak or if I do I am treated with disrespect."[5]  (Id.).

In November 2002, Eichler sought to take an extra vacation day to

accommodate her Thanksgiving travel plans.  (Eichler Dep. 37).  When she announced

---

[4]      This email and several others identify the sender as Mary Henry.  Henry was
Eichler's name before her marriage to Robert Eichler, another AIMA employee.  (Eichler Dep.
72-73).

[5]      Corteselli's response to this email is not included in the parties' submissions
regarding AIG's motion for summary judgment.

her intentions, Corteselli apparently had a tantrum and cursed at her.  (Id. at 38).  Shortly

thereafter, Eichler sent a letter to Ferguson and Gillen concerning Corteselli's "Continued

Verbal/Mental Abuse."  (Ex. G).  The letter, which took the form of an attachment to an

email, was dated November 26, 2002.  It stated:

> Having had little else on my mind today after Vince
> Corteselli's outburst repetitively yelling at me to shut the fuck
> up and get the fuck out of his office when trying to
> communicate a change in vacation/personal days, I again feel
> it necessary to document what I find as unacceptable and
> inappropriate behavior.
>
> . . . .
>
> When I arrived this morning Paul had invited me into his
> office to share in some bite size cheese cakes he brought in
> for the group.  As Vince, Paul and I were together at the time
> I asked to speak to both Vince and Paul at the same time
> about what time I would like to take.  Vince began to yell, and
> curse and stormed out of Paul's office before I was able to
> communicate my needs.
>
> I left Paul's office and went immediately into Vince's to try to
> talk to him.  As soon as I stepped in he started yelling at me
> and told me to get the fuck out [and] that he was going to treat
> me with the same respect I treat him with.  Quite frankly
> Vince has made it clear on many occasions since this past
> spring that I have no value, as far as he is concerned.  Respect
> is not something I have been shown from him.  He has even
> gone as far as telling me how "stupid" I am to want to use the
> computer systems available to me[;] that it is simply
> management's way to trap me so they can fire me.
>
> No matter how hard I try or how much I do I am continually
> put down, criticized and abused by Vince.  I have gone out of
> my way to try to include him in keeping him aware of my
> work load and even tried to share some humor and lighten our
> very tense relationship by including him.

. . . .

> Being aware that steps are being taken in approximately
> January 2003 where I will be training someone on the follow
> the lead Hull procedures and will be handling primarily cargo
> claims, it is also my understanding at that time that I will no
> longer be reporting to Vince[.]  I would like to know what can
> be done to eliminate the abuse that I am being subject to at
> this time.

(Exs. G, N).

Following his receipt of the letter, Gillen spoke with Eichler and told her

not to discuss the problem with the Human Resources department at AIG.  (Eichler Dep.

66).  Despite that admonition, however, Gillen himself emailed a copy of Eichler's letter

to Donna Waithe-Byron ("Byron"), an AIG Human Resources department employee.

(Ex. N; Byron Dep. 24-25).  In his email, Gillen noted that

> subsequent to this complaint, Vince and Mary met, briefly[,]
> and have allegedly mended the fence.  I have had an informal
> conversation with Vince with Mr. Ferguson present advising
> him of the inappropriate nature of his treatment of Mary and
> that we (Paul and I) would be meeting with him formally this
> week to discuss the situation.

(Ex. N).  Byron does not recall taking any steps to follow up on this email.  (Byron Dep.

27, 39-40).  It also appears that no sanctions were visited upon Corteselli as a

consequence of his tirade, other than Ferguson reading him the "riot act."  (Ex. M at 1;

Corteselli Dep. 180-84).  Corteselli apologized to Eichler after Ferguson noted that this

"would seem to be appropriate."  (Id. at 182).

8

Although Eichler at first thought that the matter had been resolved, she soon discovered that Corteselli "would not acknowledge [her] presence, would not speak with her and would not meet with her."  (Ex. M at 2).  Apparently, neither Ferguson nor Gillen told Eichler that her reporting relationship had been changed such that all of her future communications with Corteselli were to take the form of emails.  (Id. at 2-3).

On or about February 25, 2003, Eichler notified Ferguson that she wished to resign, but she gave AIG sixty days' notice because she needed to find another job. (Eichler Dep. 95-97; Ex. 10).  The following Monday, Eichler rescinded her resignation after meeting with Michael Festo ("Festo"), the AIG Human Resources manager, who promised to conduct an investigation of her allegations.  (Eichler Dep. 97-106, 114-16). Festo had directed Eichler to meet with Donna Napotnik ("Napotnik"), one of his subordinates.  (Id. at 106).   During the ensuing meeting, Eichler provided Napotnik with a written statement.[6]  (Id. at 112-13).

On March 6, 2003, Eichler sent Festo a letter confirming that she had rescinded her resignation.  (Ex. 11).  In that letter, Eichler also thanked Festo for the opportunity to meet with him and Napotnik, as well as his "anticipated assistance in helping [her] to obtain a transfer within AIG."  (Id.).

---

[6]      Eichler maintains that Napotnik's interview of her was tape recorded.  (See Eichler Dep. 106; Pl.'s R. 56.1 Stmt. ¶ 24).  During her deposition, however, Napotnik testified that she never tape recorded any conversations while she was at AIG.  (Napotnik Dep. 64).

In her subsequent written summary of the results of her investigation, Napotnik reported that Eichler had conceded during her interview that she had developed a significant backlog in claims processing.  (Ex. M at 1).  Napotnik's report further indicated that one of the disputes between Eichler and Corteselli related to Eichler's desire to convert manual file notes regarding claims into computer entries, a process that Corteselli believed was unnecessary.[7]  (Id. at 1-2).  Although Eichler offered to come in on weekends to make the necessary data entries, Corteselli rejected that request, as well as a related request for a laptop computer so she could work outside the office.  (Id.).  Corteselli explained to Napotnik that he denied Eichler's request to have access to the office on weekends because Eichler wanted to bring her five children with her.  (Id. at 2).  Eichler, however, vehemently denies that she ever expressed a desire to have her children accompany her.  (Eichler Dep. 34).

Napotnik's report also noted that Corteselli made various offensive statements during her own interview of him, such as repeatedly referring to Mitsumi as the "Japanese girl."  (Ex. M at 3).  Napotnik noted that AIG would never know whether Eichler could have performed her duties at AIMA adequately under "ideal conditions." (Id.).  She therefore recommended that Eichler be placed "in an appropriate position within another group where her performance can be neutrally evaluated."  (Id.).

---

[7]     On the other hand, Gillen apparently thought that Eichler's desire to create computerized diary entries was "a good thing."  (Ex. M at 2).

On March 5, 2003, having not yet heard the results of Napotnik's investigation, Eichler sent Festo an email setting forth the history of her dealings with Corteselli.  (Ex. I).  Eichler stated that:

- In the spring of 2002, when she requested additional office access so that she could keep up with her work, Corteselli told her that she was "stupid" and "that even a Japanese girl who could not speak English could do it."  Eichler told Ferguson about these remarks, as well as Corteselli's comment that Eichler could make mistakes because she had breasts.

- Around Thanksgiving in 2002, after Corteselli's outburst, Gillen had assured her that there would be no recurrence, and Corteselli had apologized.  Nonetheless, Eichler thereafter was "ignored unless it became absolutely necessary to speak to [her]."  When Eichler subsequently advised Ferguson that she was thinking about quitting, he indicated that he would accept her resignation.  During that same discussion, Eichler complained to Ferguson that Corteselli had made demeaning comments about "women being second class citizens in most other countries" and had said to her, "what do you think I sit around here holding my d— in my hand[?]"

- Subsequently, Eichler spoke with Gillen, who told her that he previously was unaware of the situation concerning Corteselli and that it would be investigated.  Gillen also stated that "he felt bad that [Eichler] did not come to him before going to HR and that he would try to aid in finding [Eichler] another position within AIG."

(Id.).

That same month, Eichler was placed on indefinite paid leave while AIG attempted to find her another suitable position.  (Eichler Dep. 107).  After more than four months of paid leave, during which she was able to work part time in a picture-framing shop, Eichler was offered and accepted a temporary training position in AIG's workers compensation claim department.  (Id. at 120-28).  Before doing so, she emailed Napotnik

11

that she was willing to train at her current salary for six months, on the understanding that she then would be given "the merit increase that was due in June 2003 along with a substantial increase to compensate [her] for the increased responsibilities and travel" that her new job entailed.  (Ex. K).  Eichler thereafter began to work in her new job on or about August 4, 2003.  (Eichler Dep. 138-39).  In that position, she reported to John Russo ("Russo").  (Id. at 123, 139).

On November 10, 2003, Eichler discovered that she had been evaluated by Ferguson, despite AIG's prior promise that she would receive a "neutral evaluation" following her return to active duty.  (Id. at 140-41).  After Eichler complained, she was reevaluated by Russo.  (Id. at 149-58; Napotnik Dep. 218-20).

In January 2004, Eichler's salary was raised from $55,000 to $60,000 per year, an increase of approximately nine percent.  (Eichler Dep. 159).  At the time, Russo informed her that "increases ran around 3 percent company-wide."  (Id. at 160).  Although Eichler testified that she expected a $15,000 raise, she conceded that nobody ever promised her such an increase.  (Id. at 162).  She nevertheless believed that the increase did not constitute the "substantial" raise that she deserved, and that it failed to compensate her adequately for AIG's failure to give her a raise in 2003.[8]  (Ex. P).

On February 13, 2004, Eichler sent Festo, Napotnik and other AIG officials an email regarding "Yesterday's Meeting."  (Ex. J).  This email evidently was a reaction

---

[8]     Eichler testified that she had "promised [her] son [that she] would double [her] salary in five years so he'd be able to go to college."  (Id. at 53).

to an email that Festo had sent to Eichler earlier that day, in which he inquired whether an allegation that Eichler had made during their meeting regarding "tits in face" was new. (Id. at 2).  Festo also had suggested in his email that Eichler was unwilling to cooperate with the Human Resources department, an accusation that Eichler strenuously denied. (Id. at 1, 2).  Eichler's email complained that Festo had been aware of her "allegations of sexual harassment, hostile work environment, ect. [sic] last spring."  (Id. at 1).  Eichler also alleged that Napotnik had "misrepresented" the compensation that she would receive in her new position, and surmised that this misrepresentation must have been instigated by Festo.  (Id.).  The email concluded:  "Your hostility yesterday was evident and undeserved.  HOW DARE YOU!!!!"  (Id. at 2).

Eichler tendered her resignation on March 22, 2004, stating that it would be effective two weeks hence.  (Ex. R).  In her resignation letter, Eichler claimed that she was leaving "due to the sexual harassment, bullying, hostile work environment, and manipulative professional practices endorsed by AIG as a whole."[9]  (Id.).  Eichler also contended that "the environment [had] been so hostile, and the effects so devastating[,] that [she had] no choice other then [sic] to resign."  (Id.).

_____

[9]      The manipulative professional practices reference evidently reflected Eichler's belief that AIG was manipulating its reserves to boost its recorded profitability.  (Id.).

13

II.     Discussion

    A.     General Legal Principles

        1.     Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only when:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).

In deciding a motion for summary judgment, the court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and . . . draw all permissible inferences in favor of that party."  Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).  The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material.  See Kulak v. City of New York, 88 F.3d 63, 70 (2d Cir. 1996).  Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court.  Fischl, 128 F.3d at 55.  See also Fed. R. Civ. P. 56(e) 1963 advisory committee's note.  Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried."  Fischl, 128 F.3d at 55.

To defeat a motion for summary judgment, the non-moving party cannot merely rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

## 2.   Applicable Substantive Law

This case differs from many employment discrimination cases brought in federal court in that it arises under the Court's diversity jurisdiction, 28 U.S.C. § 1332(a)(1), with the plaintiff relying exclusively on state and local antidiscrimination statutes as the basis for her claims.  Nevertheless, the parties have cited only federal case law in their legal memoranda.  It is, of course, well settled that claims of a hostile work environment, retaliation, and constructive discharge under the state and city human rights laws are subject to the same legal standards, and therefore may be analyzed in the same manner, as claims under Title VII of the Civil Rights Act of 1964.  <u>See, e.g.</u>, <u>Sowemino v. D.A.O.R. Sec., Inc.</u>, 43 F. Supp. 2d 477, 484 (S.D.N.Y. 1999); <u>Cunningham v. Consol. Edison Inc.</u>, No. CV-03-3522(CPS), 2006 WL 842914, *15 n.10 (E.D.N.Y. Mar. 28, 2006); <u>King v. Friend of a Farmer Corp.</u>, No. 97 CV 9264, 2001 WL 849460, *1 (S.D.N.Y. July 26, 2001).  Accordingly, the discussion that follows generally relies on federal case law.

15

B.      Hostile Work Environment

Eichler's first claim is that she was subjected to a hostile work environment created by Corteselli and other AIG supervisory personnel.  (See Compl. ¶¶ 30-41).  Although supervisors may be held individually liable under the state and local antidiscrimination laws, see Sowemino, 43 F. Supp. 2d at 490, Eichler has named only AIG as a defendant in this action.  (See Compl. ¶ 2).  Accordingly, to prevail on her hostile work environment claim, Eichler must prove that AIG is vicariously liable for the conduct of its supervisors.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 754-55 (1998) ("Congress has directed federal courts to interpret Title VII based on agency principles.  We rely on the general common law of agency, rather than on the law of any particular state to give meaning to these terms."); Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 72 (1986) ("Congress wanted courts to look to agency principles for guidance in this area."); Mack v. Otis Elevator Co., 326 F.3d 116, 123 (2d Cir. 2003) ("[I]t is only when a 'supervisor with immediate (or successively higher) authority over the employee' has engaged in the complained of conduct, that the 'employer [may be] subject to vicarious liability.'") (alteration in original) (quoting Ellerth, 524 U.S. at 765 and Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1962)).

Vicarious liability is based on the maxim that a master may be held liable for the acts of its servants undertaken within the scope of their employment.  See Ellerth, 524 U.S. at 756 (quoting Restatement (Second) of Agency § 219(1) (1957)).  In the employment discrimination context, the first question that must be answered in

16

connection with an inquiry into vicarious liability is whether the supervisor's behavior "culminate[d] in a tangible employment action" against the employee, "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 765.  If it did, "the employer will, ipso facto, be vicariously liable." Mack, 326 F.3d at 124; accord Fairbrother v. Morrison, 412 F.3d 39, 49 (2d Cir. 2005).  On the other hand, if the employer either took no tangible employment action, or "any tangible employment action was not part of the supervisor's discriminatory harassment," "the employer may have recourse to the so-called Faragher/Ellerth affirmative defense." Ferraro, 440 F.3d at 101 (citing Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765.  "That defense requires the employer to show that ([1]) it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' and ([2]) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" Fairbrother, 412 F.2d at 49 (quoting Ellerth, 524 U.S. at 765).  When both of these requirements are met, the employer cannot be held vicariously liable. Id.

In her opposition papers, Eichler impliedly concedes that tangible employment action was not part of Corteselli's alleged harassment by addressing the two elements of the defense without attempting to argue that Corteselli had engaged in a tangible employment action.  (See Pl.'s Mem. at 5-8).  Accordingly, I will turn directly to the two elements of the Faragher/Ellerth defense.  Ferraro, 440 F.3d at 101-02.

17

The first element of the Faragher/Ellerth defense requires an employer to establish that it exercised reasonable care to prevent or correct the sexually harassing behavior. Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 295 (2d Cir. 1999). An important – although not necessarily dispositive – factor with respect to this element is "the existence of an anti-harassment policy with complaint procedures." Id.; accord Ferraro, 440 F.3d at 102. In that regard, it is undisputed that at the outset of her employment Eichler received a copy of AIG's employee handbook, which contained a copy of its non-harassment policy. Furthermore, that policy included a specific protocol for harassment complaints, which directed an employee who believed that she was the victim of "discriminatory harassment" to report the incident immediately to a Human Resources Manager, AIG's Corporate Employee Relations department, or the Office of AIG's General Counsel. (Exs. 1, 2).

In an effort to avoid the Faragher/Ellerth defense, Eichler contends that AIG's policy was ineffective as a matter of law because of AIG's "multiple failures" to investigate her complaints. (Pl.'s Mem. at 6). However, as explained in further detail below, the undisputed evidence shows that Eichler never properly availed herself of the procedures set forth in the AIG anti-harassment policy during the period that she allegedly was being victimized. Moreover, it is settled law that "[a]n employer need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct." Leopold v. Baccarat, Inc., 239 F.3d 243, 245 (2d Cir. 2001) (quoting Caridad, 191 F.3d at 295).

18

Consequently, because AIG had a facially-valid policy, and Eichler has not shown that it was ineffective, AIG has satisfied the first element of its affirmative defense.

The second element of the Faragher/Ellerth affirmative defense requires AIG to show that Eichler unreasonably failed to take advantage of the avenues of relief that AIG afforded to its employees who were victims of discriminatory harassment. As to this issue,

> [o]nce an employer has satisfied its initial burden of demonstrating that an employee has completely failed to avail herself of the complaint procedure[s], the burden of production shifts to the employee to come forward with one or more reasons why the employee did not make use of the procedures. The employer may rely upon the absence or inadequacy of such a justification in carrying its ultimate burden of persuasion.

Id. at 246.

Eichler contends that AIG cannot satisfy its initial burden with respect to this element because she complained to "AIG's upper management in November of 2002 who, in turn, informed Waithe-B[yr]on, human resources manager, of Corteselli's abusive and discriminatory behavior." (Pl.'s Mem. at 7). Eichler further contends that "AIG's human resources [department] failed to follow up, investigate and remediate the hostile work environment." (Id.). In similar fashion, Eichler alleges that "the record is replete with . . . AIG's failure to respond to [Eichler's] complaints." (Id.).

Although Eichler twice complained in writing to managers who were senior to Corteselli, neither of these written complaints made any mention of sexual harassment.

19

Instead, Eichler's April 2002 memo simply alleged that Corteselli was being

disrespectful, "nasty," and not constructive, and that she and he were "go[ing] at it" in a

manner that was disruptive to their co-workers.  (Ex. L).  Similarly, Eichler's November

2002 memo related to an incident in which Corteselli had an "outburst" and repeatedly

shouted that Eichler should "shut the fuck up and get the fuck out of his office."  (Ex. G).

It is readily apparent that the use of the word "fuck" in this manner did not have a sexual

connotation.  In fact, it added nothing to Corteselli's statement other than an indication

that he <u>really</u> wanted Eichler to be quiet and leave.  It thus was merely an intensifier.  <u>See

Compact Oxford English Dictionary</u> 641 (New ed. 1998) (citing W. Burroughs, <u>Naked

Lunch</u> 63 (1959) ("How in the fuck should I know?"), & G. Lord, <u>Marshmallow Pie</u> 136

(1970) ("What the fuck do you think you're doing?")).  While it may have been

inappropriate for Corteselli to use this form of emphasis, as he later impliedly

acknowledged by apologizing to Eichler, the antidiscrimination statutes are not a code of

civility.  <u>See Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998).

   Accordingly, Eichler's emails, which made no mention of sexual

harassment, were insufficient to put AIG on notice that she was complaining about a

sexually-hostile work environment or any other violation of the employment laws.  <u>See,

e.g.</u>, <u>Ferraro</u>, 440 F.2d at 103 (complaint that supervisor had angrily told an employee to

"get of out my f'ing office" "comport[ed] with the view [that he was] a short-tempered

and foul-mouthed supervisor" but did not indicate that the "outburst was motivated by

any prohibited discriminatory animus").  The failure of the recipients of the memos to act

therefore does not show that AIG's non-harassment procedures were ineffective.

       Moreover, even if Ferguson or Gillen were aware – through the emails or

otherwise – that Corteselli was engaging in sexual harassment, they were not among the

individuals designated in the AIG anti-harassment policy to receive and respond to such

complaints.  The fact that the procedures relating to harassment complaints differed

substantially from the procedures for other complaints also served to put Eichler on notice

that notifications to line supervisors were not the appropriate way to bring complaints of a

sexually-hostile work environment to AIG's attention.  This point should also have been

driven home to her by Gillen's efforts to discourage her from reporting the November

incident to Human Resources.

       The fact that Gillen subsequently forwarded a copy of Eichler's November

email to Byron does not excuse her own failure to deal directly with one of the three

offices that AIG had designated to handle complaints of discriminatory harassment.  At

the outset, as noted earlier, that email did not contain any indication that Corteselli had

engaged in anything other than extremely discourteous conduct, which, by itself, is not a

violation of the anti-discrimination laws.  Additionally, the very email forwarding

Eichler's complaint noted that Corteselli had been cautioned that his conduct was

inappropriate, and that Eichler and Corteselli had "mended the fence."  (See Ex. N).

Accordingly, because Eichler failed to indicate anything to the contrary in a direct

communication with Human Resources, it was reasonable for Byron to conclude on behalf of AIG that there was no unlawful conduct to investigate.

Furthermore, an employee who improperly delays in bringing a harassment complaint to the attention of her employer breaches her "obligation of reasonable care to avoid harm."  Barua v. Credit-Lyonnais, No. 97 Civ. 7991 (JSR), 1998 WL 915892, at *4 (S.D.N.Y. Dec. 30, 1998) (quoting Faragher, 524 U.S. at 778).  In her complaint, Eichler contends that she was subjected to harassment on a daily basis "from the inception of her employment."  (Compl. ¶ 8).  Nevertheless, it was not until February 2003 that she notified Human Resources that she had been subjected to a sexually-hostile work environment.  This was more than one year after she alleges the harassment began.  Accordingly, unless there was some justification for her delay, the lengthy period of time that Eichler waited before reporting her complaint plainly was unreasonable.  See, e.g., Williams v. Mo. Dep't of Mental Health, 407 F.3d 972, 976-77 (8th Cir. 2005) (summary judgment proper where one plaintiff never reported the harassment and the other first did so "four months after the fact . . . [when] a supervisor pressed her for details"); Gawley v. Ind. Univ., 276 F.3d 201, 312 (affirming summary judgment because plaintiff "waited seven months before availing herself of the formal complaint procedures available through [her employer]"); Reed v. Belknap Heating & Cooling, Inc., No. 01-CV-0829E(SC), 2004 WL 912877, at *1, *6 (W.D.N.Y. Apr. 20, 2004) (plaintiff employed for four months acted unreasonably by failing to report the problem to anyone other than the supervisor harassing her until two days before she left her job); Dayes v.

22

<u>Pace Univ.</u>, No. 98 Civ. 3675 (WHP), 2000 WL 307382 (S.D.N.Y. Mar. 24, 2000) ("Plaintiff's one-year delay in bringing her complaint to the attention of management was unreasonable as a matter of law"); <u>Schmidt v. SUNY at Stonybrook</u>, No. 02CV6083 (SLT), 2006 WL 1307925, at *14 (E.D.N.Y. May 9, 2006) (same; citing <u>Dayes</u>).

In her opposition papers, Eichler argues that her failure to use AIG's established procedures was reasonable because Gillen and Ferguson both "told her not to inform human resources or problems would result."  (Pl.'s Mem. at 7).  There is, in fact, <u>no</u> evidence before this Court to indicate that Ferguson made such a request.  Moreover, Gillen made his statement to Eichler in November 2002, some eleven months after the harassment allegedly began.  The fact that Gillen discouraged her from filing a report at that time, even if proved, obviously does not excuse Eichler's failure to make a proper report at a much earlier time.

Eichler also cannot justify her failure to avail herself of AIG's established complaint procedures on the basis of Human Resources' conceded failure to act on her November 2002 memorandum.  At the outset, the record establishes that Eichler never reported anything, much less sexual harassment, to Human Resources in November 2002. There also has been no showing that Eichler was even aware in November 2002 that her memo had been forwarded to Human Resources.  In fact, Eichler testified that she did not learn that her memo had been forwarded there until AIG's counsel made that disclosure to her during her deposition.  (Eichler Dep. 66).  Obviously, if Eichler did not know that

Human Resources had been alerted to her complaint, she could not have relied on its conceded failure to respond as a justification for her failure to follow AIG's procedures.

It also bears mention that Eichler testified at her deposition that Corteselli had indicated in her presence, on "at least a half dozen occasions," that he could have had her stoned to death had they been in Iran.  (<u>Id.</u> at 48-49).  She also learned from a coworker that Corteselli made a similar comment when she was not present.  (<u>Id.</u> at 47).  As Eichler explained, she failed to take any action in response to these statements because she "didn't want people going, Look at her, she's the cry-baby."  (<u>Id.</u>).  Even if the Court were to assume that this rationale for failing to make a timely report extended to all of Corteselli's misdeeds, it is settled law that unwillingness to be tagged as a complainer is not an adequate justification for Eichler's delayed reported to Human Resources.  <u>See, e.g.</u>, <u>Petro v. Outback Steakhouse of Fla.</u>, No. 3:04-CV-928, 2006 WL 273133, at *4 (N.D.N.Y. Jan. 31, 2006) (granting summary judgment where plaintiff's only excuse for failing to follow the complaint procedure was a desire "not to cause any major commotion . . . or conflict"); <u>Breeding v. Cendant Corp.</u>, No. 01 Civ. 11563 (GEL), 2003 WL 1907971, at *7-*8 (S.D.N.Y. Apr. 17, 2003) (<u>Faragher/Ellerth</u> defense available to employer despite employee's fear that "'creating any kind of waves' could cause retaliation or hurt her opportunities").

Finally, even if Eichler thought that she would be subjected to retaliation if she made a report, her reluctance to comply with AIG's established procedures for the reporting of sexual harassment cannot preclude AIG from asserting the <u>Faragher/Ellerth</u>

24

defense unless she had "a credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint." Leopold, 239 F.3d at 246 (quoting Caridad, 191 F.3d at 295).  A "credible fear" "must be based on more than an employee's subjective belief.  There must be evidence to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints." Id.  In this case, however, there has been no showing of any previous instances in which AIG failed to act promptly when sexual harassment was reported to its management through the proper channels or that the employees who made such reports became victims of retaliation.

In sum, Eichler unreasonably failed to avail herself of the procedures set forth in the AIG employee handbook for the reporting and subsequent resolution of sexual harassment complaints.  Her hostile work environment claim against AIG consequently must be dismissed because AIG has established its right to rely upon the Faragher/Ellerth affirmative defense.

C.    Retaliation

Eichler's second claim is that AIG retaliated against her following the disclosure of Corteselli's harassing conduct.  (Compl. ¶¶ 58-65).  In her complaint and deposition, Eichler identified two such modes of retaliation:  Ferguson's negative evaluation of her and AIG's decision to award her a salary increase which was less than the amount she believed she had been promised and deserved.  (Id. ¶¶ 25, 26; Eichler Dep. 144-45).  In her papers opposing summary judgment, Eichler no longer presses

25

either of these bases for her retaliation claim.  Instead, she now contends only that AIG's

decision to place her on paid leave was retaliatory.  (Eichler Mem. at 11-12).  As she

explains:

> In effect, the extended paid leave stripped [her] of all of her
> material responsibilities and relegated her, without any real
> assistance from . . . AIG to searching for and interviewing for
> a new job . . . . While at home, [her] job skills and career
> opportunities atrophied and stagnated.  Equally important, this
> paid leave had a significant, adverse emotional impact on
> [her].

(Id.).

AIG argues that this "new theory" of retaliation must be rejected for several

reasons.  First, AIG asserts that Eichler cannot be permitted to "inject a new theory" of

retaliation into this case at this stage in an effort to avoid summary judgment.  (AIG

Reply Mem. at 12-13).  Second, AIG alleges that Eichler's paid leave did not constitute

an adverse action because she had resigned by the time that it was offered to her.  (Id. at

13-15).  Finally, AIG suggests that Eichler cannot prove that the need to "address her

proposed resignation," which is its stated reason for imposing the leave, was pretextual.

(Id. at 15 n.3).

     1.    New Theory

AIG is correct that a plaintiff cannot constructively amend a complaint at

the summary judgment stage to interpose a claim not previously asserted.  This principle

is well illustrated by Judge Conner's decision in Kearney v. County of Rockland, 373 F.

Supp. 2d 434 (S.D.N.Y. 2005).  There, the plaintiff's "exceedingly vague" complaint

alleged that she was denied a promotion and was transferred to another unit on the basis of her age or as an act of retaliation.  Id. at 437-38 & n.2.  The plaintiff cited three specific acts – including pushing her during the course of an altercation – which were alleged to be discriminatory or retaliatory.  Id. at 437-38.  The court noted that the plaintiff also informed the defendant county at some point that she suffered from attention deficit disorder and requested certain accommodations under the Americans with Disabilities Act.  Id. at 439.  Subsequently, however, in her papers opposing summary judgment, the plaintiff alleged "for the first time" that she had been subjected to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964.  Id. at 440. The court declined to consider this last claim because "nothing" in either the plaintiff's complaint or the EEOC charge had put the defendants on notice of this claim.  Id.

Similarly, in Rochester v. Blue Cross and Blue Shield, No. 98-CV-2436, 2000 WL 1052064, at *1-*2 (E.D.N.Y. June 27, 2000), the plaintiff alleged that she was evaluated unfairly, denied promotions, and eventually demoted from her position in the defendant's computer department on the basis of her race, sex, and national origin.  In her EEOC complaint, the plaintiff also alleged that she had been the victim of religious discrimination.  Id. at *2.  In opposing summary judgment, the plaintiff departed from these factual and legal contentions, alleging that an inference of discrimination also arose from the fact that she was the only lead computer peripheral operator required to clean computer tapes.  Id. at *6.  The court declined to consider this allegation, however,

27

because neither the plaintiff's complaint nor the EEOC charge put the defendant on notice that it would be raised.  Id.

The complaint in this case by comparison expressly discusses not only the negative performance evaluation that Ferguson gave to Eichler and her allegedly inadequate raise, but also AIG's decision to place her on paid leave.  (Compl. ¶¶ 11(a), (b), 25, 26).  Thereafter, in her Fifth and Sixth Claims for Relief, which relate to retaliation, Eichler "repeats and realleges" all the previous paragraphs of her complaint. (Id. ¶¶ 58, 62).  These claims then further allege that, by reason of the "aforesaid conduct," AIG retaliated against her in violation of the New York State and New York City Human Rights laws.  (See id. ¶¶  61, 65).

As the Supreme Court noted in Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 511 (2002), the Federal Rules of Civil Procedure require only notice pleading.  Here, the complaint clearly stated that AIG retaliated against Eichler for making "complaints of sexual harassment."  (Id.).  While the complaint did not expressly reference Eichler's paid leave as an act of retaliation, it nonetheless made it clear that Eichler was asserting claims of retaliation under both state and local law, and it identified numerous actions that AIG had taken, including the decision to place her on paid leave.  Although the complaint did not specifically link the paid leave to Eichler's retaliation claims, those claims in effect incorporated by reference all of the objectionable conduct previously recited in the complaint.  For this reason, the Court cannot refuse to consider paid leave as a potential

28

act of retaliation on the theory that there is a variance between the complaint and Eichler's present legal and factual assertions.

In a similar vein, AIG complains that Eichler did not mention her paid leave when she was asked to specify AIG's acts of retaliation during her deposition. (Def.'s Reply Mem. at 12). Nonetheless, in response to this line of inquiry, Eichler testified that she believed that "Human Resources" – specifically, Festo, Napotnik, and "whoever was the boss there" – had participated in the attempts at retaliation to which she was subjected. (Eichler Dep. 139-40). Subsequently, after Eichler enumerated several acts that she believed were retaliatory, she was asked whether there was "anything else that [she] thought was done in retaliation." (Id. at 145). She responded, "Not that I remember." (Id.). Although she failed to mention her paid leave at that time, there has been no showing that this was anything more than a failure of recollection. Accordingly, this case is not akin to one in which a party improperly seeks to oppose summary judgment on the basis of an affidavit which is inconsistent with her prior deposition testimony. See, e.g., Jackson v. City Univ. of N.Y., No. 05 Civ. 8712 (JSR), 2006 WL 1751247, at *1 n.1 (S.D.N.Y. June 23, 2006).

For these reasons, Eichler is entitled to have this Court consider her theory that her paid leave constituted an unlawful act of retaliation.

2.    Adverse Action

A retaliation claim is "not dependent on the merits of the underlying discrimination complaint." Davis v. State Univ. of N.Y., 802 F.2d 638, 642 (2d Cir.

1986).  Accordingly, to establish a prima facie case of retaliation, an employee need only

show that:  (a) she engaged in a protected activity; (b) the employer knew of this activity;

(c) the employer took adverse action against the employee; and (d) there was a causal

relation between the adverse action and the employee's protected activity.  Cifra v. Gen.

Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001); Holt v. KMI-Cont'l, Inc., 95 F.3d 123, 130

(2d Cir. 1996).  Here, AIG argues that Eichler cannot meet the third of these requirements

because her paid leave, as a matter of law, was not an "adverse action."  (Def.'s Reply

Mem. at 13).  AIG also contends that Eichler has failed to show, as she must, that its

asserted nondiscriminatory reason for imposing the leave was pretextual.  (Id. at 15 n.3).

An "adverse employment action" is something "more disruptive than a

mere inconvenience or an alteration of job responsibilities."  Galabya v. N.Y. City Bd. of

Educ., 202 F.3d 636, 640 (2d Cir. 2000) (quoting Crady v. Liberty Nat'l Bank & Trust

Co., 993 F.2d 132, 136 (7th Cir. 1993)).  To reach the requisite level, the action must

constitute a "'materially adverse change' in the terms and conditions of employment."

Pimentel v. City of New York, No. 00 Civ. 326 (SAS), 2002 WL 977535, at *3 (S.D.N.Y.

May 14, 2002) (quoting Galabya, 202 F.3d at 640).  Among the actions that may qualify

are a "termination of employment, a demotion evidenced by a decrease in wage or salary,

a less distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indices . . . unique to a particular situation."  Weeks v. N.Y.S.

(Div. of Parole), 273 F.3d 76, 85 (2d Cir. 2001) (quoting Galabya, 202 F.3d at 640)

(ellipsis in original).

The standard applicable to this inquiry is an objective one.  Consequently, to prevail on a retaliation claim, "a plaintiff must show that a <u>reasonable</u> employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 126 S. Ct. 2405, 2415 (2006) (emphasis added and internal quotation marks omitted).  Courts utilize such a standard because it "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings."  <u>Id.</u>  Nevertheless, context matters. <u>Id.</u>  As the Supreme Court has explained:

> A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children.  A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

<u>Id.</u> at 2415-16.

In this case, in order to induce Eichler to rescind her resignation, AIG offered her paid leave until such time as it was able to find her a suitable alternative job. In an attempt to establish that this decision rises to the level of an adverse action, Eichler argues that she was "relegated to her home in New Jersey," "denied the opportunity to work," and forced to search and interview for a new job "without any real assistance from . . . AIG."  (Pl.'s Mem. at 11 (citing Pl.'s R. 56.1 Stmt. ¶¶ 10, 13, 25)).  Eichler also

alleges that while she was at home her "job skills and career opportunities atrophied and stagnated."  (<u>Id.</u> at 12 (citing Pl.'s R. 56.1 Stmt. ¶ 32)).  Finally, Eichler contends that while she was at home she was extremely depressed and suffered other emotional problems caused by AIG.  (<u>Id.</u>).

Contrary to Eichler's assertion, the first three cited paragraphs of her Rule 56.1 Statement, (<u>see</u> Pl.'s R. 56.1 Stmt. ¶¶ 10, 13, 25), are not supported by any evidence which indicates that Eichler was forced to search and interview for a new job without assistance from AIG.  Similarly, paragraph 32 of her Rule 56.1 Statement is not based on any evidence which shows that Eichler's job skills and career opportunities were in any way diminished while she was on paid leave.  Indeed, the sole source cited in that paragraph is a psychological evaluation of Eichler prepared for purposes of this litigation. To the extent that this evaluation is relevant and admissible, it is to establish that Eichler suffered from depression or other emotional problems caused, at least in part, by her inability to work.  (<u>See</u> Eichler Ex. F (Report of Susan Cohen Esquilin, Ph.D.)).  Eichler's own emotional state, however, is not the issue before the Court.  Rather, the question that the Court must consider is whether a reasonable employee would have considered AIG's decision to place her on paid leave sufficiently adverse that it would have deterred her from filing a sexual harassment complaint.  <u>White</u>, 126 S. Ct. at 2415.

Only a few months ago, the Second Circuit addressed for the first time whether a period of paid leave may constitute an "adverse employment action."  In <u>Joseph v. Leavitt</u>, 465 F.3d 87 (2d Cir. 2006), an employee of the United States Food and Drug

32

Administration ("FDA") was charged with a felony assault following an altercation with his girlfriend having nothing to do with his work.  The FDA nonetheless placed the plaintiff on administrative leave with full pay, and it continued him in that status for an additional five months after the criminal charges were dismissed so that it could complete its own inquiry.  Thereafter, the FDA reinstated the plaintiff to his former position. Although the Court of Appeals found the continuation of the administrative leave for such an extended period following the resolution of the criminal case to be "troubling," it held – as had the Fourth, Fifth, Sixth and Ninth Circuits previously – that "administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action."  Id. at 90-91.

The circumstances here were far less adverse than those faced by the plaintiff in Joseph.  For one thing, there was no allegation that Eichler had engaged in any wrongdoing, nor was she the subject of an ongoing investigation.  Moreover, by the time that AIG proposed the paid leave arrangement, Eichler had already tendered her resignation to AIG (although she gave herself two months to find a new job). Accordingly, rather than constituting an effort to get rid of Eichler, the offer of a paid leave represented an effort to retain her as an AIG employee.  Additionally, while the period of leave was admittedly long, Eichler was not a highly trained worker – such as a neurosurgeon – whose skills might reasonably be expected to diminish if she were out of work for a period of months.  Eichler also clearly was not subject to stringent supervision while she was on leave because she was, by her own admission, able to work part time in

a picture frame store, thereby supplementing the paycheck that she was continuing to receive from AIG.  (Eichler Dep. 120-21).  Part of Eichler's leave also spanned the summer, a period when her children were home from school and she might reasonably be expected to want to spend time with them.  (Id. at 121-22).  Finally, although Eichler contends that she was essentially forced to secure her own replacement job, her deposition testimony establishes that Napotnik and others in the AIG Human Resources department in fact called her while she was on leave to arrange several interviews for her. (Id. at 122).  In these circumstances, it seems plain that a reasonable person in Eichler's circumstances would not have considered her paid leave an act of retaliation intended to chill her right to complain about Corteselli.[10]

Moreover, even if Eichler's paid leave could be considered an adverse action, her retaliation claim still would be subject to the familiar McDonnell Douglas burden-shifting analysis.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  Pursuant to that familiar rubric, once an employer furnishes a legitimate nondiscriminatory reason for its decision, the burden of persuasion shifts to the employee to "demonstrate that there is sufficient potential proof for a reasonable jury to find the

_____

[10]     Eichler cites three cases for the proposition that a "paid leave is sufficient to demonstrate an adverse employment action."  (Pl.'s Mem. at 10-11).  One of the three cases, Hartzol v. McDonald's Corp., 437 F. Supp. 2d 805 (D. Ill. 2006), involved two disciplinary suspensions, not a paid leave, and is silent on the issue before this Court.  The other two cases assume that a paid leave would qualify as an adverse action, but grant or affirm summary judgment on other grounds.  See Hsu v. West, No. 95-1667, 1996 WL 442896 (4th Cir. 1996) (unpublished opinion); McKie v. N.Y. Univ., No. 94 Civ. 8610, 2000 WL 1521200 (S.D.N.Y. Oct. 13, 2000) (Title VI case).

proffered legitimate reason merely a pretext for impermissible retaliation." Richardson v. N.Y.S. Dep't of Corr. Serv., 180 F.3d 426, 443 (2d Cir.1999).

AIG contends that its decision to place Eichler on paid leave until she could be placed in a new position was a reasonable response to her letter of resignation and revelations concerning Corteselli's alleged misconduct. Because this asserted reason for AIG's action is plainly nondiscriminatory, the burden shifts to Eichler. However, Eichler has adduced no evidence that AIG's rationale for its decision to place her on paid leave was pretextual.[11] Accordingly, even if Eichler's paid leave were to be considered an

---

[11]     In her memorandum of law, Eichler anticipates an argument by AIG that it simply was trying "to protect her and get her away from Corteselli." (Pl.'s Mem. at 12). Eichler contends that there is a material issue of fact regarding the truthfulness of this purported justification for AIG's actions because AIG never punished or transferred Corteselli, "the confirmed wrongdoer." (Id.). However, the fact that Corteselli was never disciplined, even if established, does not suggest that AIG's reasons for granting Eichler a paid leave until she could be transferred elsewhere were pretextual or that retaliation against her was the true rationale for AIG's response to her complaints against Corteselli. See O'Dell v. Trans World Entm't Corp., 153 F. Supp. 2d 378 (S.D.N.Y. 2001) (granting summary judgment to employer on retaliation claim despite its failure to counsel or discipline the supervisor alleged to have sexually harassed the plaintiff); see also Gonzalez v. Beth Israel Med. Ctr., 262 F. Supp. 2d 342, 355 (S.D.N.Y. 2003) ("An employer's remedy need not necessarily expel the harasser from the work environment to be effective, but rather it should be sufficiently calculated to end the harassment.") (internal quotation marks deleted).

        As an apparent afterthought, Eichler also asserts in her memorandum, without any detailed discussion, that her "subsequent transfer" constituted an adverse employment action. (See Pl.'s Mem. at 12). She had, of course, requested such a transfer as early as April 2000. (See Ex. L). In any event, here again Eichler has failed to show that AIG's asserted reason for the transfer – to attempt to retain Eichler as an employee despite her resignation – was pretextual.

35

adverse employment action, AIG still would be entitled to summary judgment on her retaliation claim.

D.   <u>Constructive Discharge</u>

Eichler's final claim is that she was constructively discharged from her position in the workers compensation department of AIG.  Such a constructive discharge occurs "when the employer, rather than acting directly, <u>deliberately</u> makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." <u>Morris v. Schroder Capital Mgmt. Int'l</u>, __F.3d__, __ (2d Cir. 2007) (quoting <u>Pena v. Brattleboro Retreat</u>, 702 F.2d 322, 325 (2d Cir. 1983)) (internal quotation marks omitted; emphasis added); <u>accord</u> <u>Terry v. Ashcroft</u>, 336 F.3d 128, 151-52 (2d Cir. 2003) ("An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily."); <u>see also</u> <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 74 (2d Cir. 2000) (noting that, at a minimum, "something beyond mere negligence or ineffectiveness is required").  In order to meet this threshold, a plaintiff "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." <u>Penn. State Police v. Suders</u>, 542 U.S. 129, 147 (2004). This standard cannot be met if an employee's working conditions are merely difficult or

unpleasant.[12]  Pena, 702 F.2d at 325; Stetson v. NYNEX Serv. Co., 995 F.2d 355, 360 (2d

Cir.1993); Cooper v. Wyeth Ayerst Lederle, 106 F. Supp. 2d 479, 497 (S.D.N.Y. 2000).

    Eichler relies on a steady accretion of alleged wrongs as the basis for her

constructive discharge claim.  Specifically, she contends that "the temporary nature of

[her] job[13] coupled with uncertainty and misrepresentations regarding her pay and other

terms and conditions of employment dashed her hopes of advancement and promotion."

(Pl.'s Mem. at 17 (citing Pl.'s Rule 56.1 Stmt. ¶¶ 34, 35)).  She also alleges that she was

"remov[ed] . . . from a job she loved and did not want to leave" and was not given the

"neutrally evaluated performance review she had been promised."  (Id. at 15 (citing Pl.'s

R. 56.1 Stmt. ¶¶ 29-32, 35, 36)).  However, even if Eichler were able to prove each of

these assertions to the jury's satisfaction during a trial of this case, she still would not be

entitled to recover damages on her constructive discharge claim because those conditions,

as a matter of law, did not leave her with no choice but to resign.  Perhaps the best

indication of this is her own resignation letter, which stated that her resignation would

take effect two weeks hence.  (Ex. R).  Obviously, if the environment to which she was

_____

[12]    In her memorandum of law, Eichler cites Kimzey v. Wal-Mart Stores, Inc., 107
F.3d 568, 574 (8th Cir. 1997), for the proposition that intolerability may be shown where "an
employee quits because she reasonably believes there is no chance for fair treatment."  In
Whidbee, the Second Circuit expressly declined to decide whether this was the correct standard.
Whidbee, 223 F.3d at 73.  The Supreme Court's subsequent decision in Suder establishes that it
is not.  See Suder, 542 U.S. at 147.

[13]    The characterization of Eichler's workers compensation job as temporary is
unsupported by the record.  By the time that Eichler alleges she was constructively discharged,
she had completed her six months of training and AIG had advised her that her position was in
the budget for a year-end increase.  (See Eichler Dep. 135, 153-54).

subjected had reached the required threshold of intolerability, she would have made her resignation effective immediately.  See Regis v. Metrop. Jewish Geriatric Ctr., No. 97-CV-906 (ILG), 2000 WL 264336, at *12 (E.D.N.Y. Jan. 11, 2000) ("An employee who remains on the job while looking for alternative employment is hard-pressed to establish that her working conditions were intolerable.").

Moreover, the issue presented by a constructive discharge claim is not whether an employee such as Eichler has lost faith in her employer on the basis of events over time, but whether a reasonable, similarly-situated employee would consider the conditions that the employee then faces to be so intolerable as to compel a resignation. For example, in Petrosino v. Bell Atlantic, 385 F.3d 210, 214 (2d Cir. 2004), as here, the plaintiff contended that she was subjected to a sexually-hostile work environment.  She also had not been given work assignments or promotions to which she believed she was entitled.  Id. at 230.  When she subsequently claimed that she had been constructively discharged, the Second Circuit characterized the issue as whether the employer's further deliberate actions at the time of her resignation had "'ratcheted' the harassment up to 'the breaking point' for a reasonable person in [her] situation."  Id. (quoting Suders, 542 U.S. at 130).  The court held that the plaintiff's dissatisfaction with her work assignments and belief that she had been misled by her employer, coupled with the failure to receive an anticipated raise and reduced promotional opportunities, still did not reach that level.  Id. at 231-32.

In this case, at best, Eichler has shown that she considered herself to be in a dead-end position, with no job security and an unacceptable salary. She also obviously distrusted her employer. Even if each of those concerns were warranted and augured in favor of her seeking employment elsewhere, nothing occurred in or around March 2004, some six months after she had returned to work, that suddenly transformed her work environment from one which was merely unpleasant to one that a reasonable person would have considered so intolerable that quitting was the only viable option.

Finally, even if a reasonable person would have so concluded, there is absolutely no admissible evidence that AIG wanted to force Eichler to leave its employ. Consequently, Eichler cannot meet the deliberateness element of a constructive discharge claim. AIG therefore is entitled to summary judgment on this claim as well.

III.    Conclusion

For the foregoing reasons, AIG's motion for summary judgment is granted and the complaint in this action is dismissed. Additionally, the Clerk of the Court is respectfully requested to close this case.

SO ORDERED.

Dated:    New York, New York
          March 23, 2007

                                        FRANK MAAS
                                United States Magistrate Judge

39

Copies to:

Christopher E. Chang, Esq.
140 Broadway, 6th Floor
New York, New York 10005
(212) 208-1468        (fax)

Kevin E. Barber, Esq.
Niedweske Barber, P.C.
98 Washington Street
Morristown, New Jersey 07960
(973) 401-0061        (fax)

P. Kevin Connelly, Esq.
Brian E. Spang, Esq.
Connelly Sheehan Harris LLP
150 South Wacker Drive
Chicago, Illinois 60606
(312) 372-1968        (fax)

Marc E. Bernstein, Esq.
70 Pine Street, 31st Floor
New York, New York 10270
(212) 344-6271        (fax)